**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA**

**Alexandria Division**

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | Civil No. 1:10-cr-395 |
| v. | Hon. Liam O'Grady |
| ZACHARY ADAM CHESSER, | |
| *Defendant.* | |

## MEMORANDUM OPINION AND ORDER

This matter comes before the Court on *pro* se Petitioner's motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255. (Dkt. No. 67). After filing this motion, Petitioner moved for leave in advance to amend or supplement his motion. (Dkt. No. 68). Petitioner has also filed a motion for the production of exculpatory evidence. (Dkt. No. 69). On June 23, 2016, Petitioner filed a supplemental motion to vacate under § 2255. (Dkt. No. 84). To establish a complete record, the Court hereby **GRANTS** Petitioner's motion to supplement his motion, and has duly considered Petitioner's supplemental filings. Upon consideration of all the filings in this case, for good cause shown, and for the reasons discussed below, Petitioner's motion under § 2255 is hereby **DENIED**.

## I. BACKGROUND

Defendant Zachary Chesser was an administrator and regular contributor with various websites, blogs, and YouTube channels tailored to individuals interested in violent jihad. In December 2009, Chesser began posted messages and content to help those who wished to engage

in violent jihad.  Among other things, the substance of these messages included: postings that encouraged others to leave "fake" suspicious packages around public places in an effort to desensitize law enforcement to bomb threats, information on manufacturing and using explosives, and manuals describing aviation security procedures.

In April 2010, Chesser used these platforms to post threatening comments, photos, and videos.  In large part, these posts came in response to an episode of the "South Park" television show, and a related Facebook group that he considered to be defamatory to the Prophet Muhammad.  The posts contained requests for others to attack specific individuals connected to the episode and the related Facebook group.

On April 15, Chesser posted a message that contained a photograph which depicted the dead, partially decapitated body of Theo van Gogh alongside the following statement:

> We have to warn [MS and TP] that what they are doing is stupid and they will probably wind up like Theo Van Gogh for airing this show.  This is not a threat, but a warning of the likely reality of what will likely happen to them.  Maybe they have not listened to this lecture before.

Statement of Facts ¶ 23C, Dkt. No. 32.

The post included audio clips of a sermon that calls for the assassination of anyone who has defamed Muhammad.  Chesser subsequently posted the addresses of Comedy Central, a Los Angeles production company associated with South Park, and a link to the South Park creators' residence with a statement that readers should "pay them a visit."  *Id.* at ¶ 23E.

Chesser also posted a message titled "Tracking Those Participating In Everyone Draw Muhammad Day" consisting of photos, names, addresses, and other personally identifying information for individuals who had expressed a desire to participate in a Facebook event called "Everyone Draw Muhammad Day."  *Id.* at ¶ 31.  Among others, Chesser included information about JG, a teenager in Mississippi, and a young man from Texas depicted in a photo with his

2

parents and a brother, along with the address of his "possible church/school." Chesser concluded his post by stating that this was "just a place to start." *Id.*

On July 10, 2010, Chesser tried to board a flight to Uganda. In preparation for this trip, he attempted to use his child to conceal his ultimate goal of travelling to Somalia to join a designated terrorist group, al-Shabaab. Chesser had previously attempted to join al-Shabaab as early as November 2009. Chesser was subsequently arrested in the airport on July 23, 2010 on charges of attempting to provide material support to the designated terrorist group, al-Shabaab, in violation of 18 U.S.C. §2339B.

Chesser was offered a plea deal which required him to plead guilty to a three-count criminal information. The counts were: (1) communicating threats in violation of 18 U.S.C. §875(c); (2) soliciting others to engage in felony crimes that had as an element the use, attempted use, or threatened use, of violence, in violation of 18 U.S.C. § 373; and (3) attempting to provide material support to the designated terrorist group known as al-Shabaab, in violation of 18 U.S.C. § 2339B. The plea agreement included a waiver of his right to appeal his conviction "on any grounds whatsoever, in exchange for the concessions made by the United States" and a waiver of his right to request or receive records regarding the investigation and prosecution of his case from any department or agency of the United States. Plea Agreement ¶ 6, Dkt. No. 31. Additionally, Chesser agreed that his attorneys, Brian Mizer and Michael (now Magistrate Judge) Nachmanoff, had provided effective assistance of counsel, and had gone over the elements and facts necessary to prove his guilt. Tr. of Hearing, Oct. 20, 2010 at 4, Dkt. No. 73.

In exchange for this guilty plea, the United States agreed to forego two further charges against Chesser; these were: (1) distribution of information regarding the manufacture of explosives, in violation of 18 U.S.C. § 842(p); and (2) soliciting murder, in violation of 18

3

U.S.C. §§ 373 and 2232. The United States also agreed to forego the prosecution of Chesser's wife on charges of conspirator or aider and abettor theories of liability, provided that she plead guilty to the charge of providing false statements. Plea Agreement ¶ 11.

At the Plea Hearing, Chesser stated that he was pleading guilty because he was, in fact, guilty of each of the counts in the three-count information. Tr. at 4. In relevant part, Chesser admitted that he understood the elements of the offense charged in Count 1 to be that he "knowingly and unlawfully transmitted in interstate and foreign commerce communications by Internet postings containing threats to injure other persons, including TP and MS and another individual described as JG in connection with the broadcast of an episode of South Park, and JG's participation in a group on Facebook." Tr. at 12. Chesser stated that he had gone over the facts necessary to prove him guilty of each count, and that he "agree[d] with all of those statements in the criminal information." *Id.*

Chesser explicitly agreed that he not only understood that his messages were objectively threatening but also that he subjectively understood them to be threats:

> THE COURT: Do you agree that you developed or used Web sites, including revolutionmuslim.com and the mujahidblog.com Web sites to transmit statements and photos and clips asserting that the South Park episode insulted Muhammad, and that the persons responsible were in grave danger and should be paid a visit by members of the Muslim community in retribution?
>
> THE DEFENDANT: Yes, sir.
>
> . . .
>
> THE COURT: All right. And you agree that the contents included photographs of those you felt were responsible for insulting Muhammad and other information about them?
>
> THE DEFENDANT: Excluding JG, yes, sir.
>
> THE COURT: Okay. Well, do you also agree that in our around May 17 of 2010, that you obtained the contact information for at least nine individuals on

4

Facebook who had joined The Everybody Draw Muhammad Day Group and transmitted that information out?

THE DEFENDANT: Yes, sir.

THE COURT: Okay. And do you agree that in looking at the information that you put out on those Web sites, and the nature of that information, that it objectively constituted messages to an audience that likely included individuals around the world who were inclined to engage in violent jihad against what they believed to be the enemies of Islam.

THE DEFENDANT: Yes, sir.

**THE COURT: And also that you understood the messages to constitute requests to attack MS, TP, and JG?**

**THE DEFENDANT: Yes, sir.**

THE COURT: And that could potentially—those persons were capable of attacking MS and TP and JG in response to those messages?

THE DEFENDANT: Yes, sir.

*Id*. at 13–14 (emphasis added).

The Court also confirmed that Chesser's attorneys had gone over the facts of the case with him, were able to answer any of his question about the relevant documents, and that he had told his attorneys everything they needed to know in order to represent him to the best of their abilities. Tr. at 3. Chesser stated that he was fully satisfied with Mr. Nachmanoff's services. *Id*. at 4. Chesser agreed that he had sufficient time to discuss the plea agreement, statement of facts, and waiver of indictment. *Id*. His attorneys confirmed that they had received discovery from the Government in regards to each allegation made, and based on the stipulated facts, there was sufficient basis for each of the three counts in the criminal information. *Id*. at 12, 16-17, 18. The Court accepted Chesser's guilty pleas, finding that he had knowingly and voluntarily entered them. *Id*. at 18-19.

Chesser was subsequently sentenced to 60 months of incarceration under Count 1 for communicating threats, 120 months of incarceration for soliciting violent or threatening conduct under Count 2, and 120 months of incarceration for providing material support to a designated terrorist organization under Count 3. The sentences were to run consecutively for a total of 25 years. Chesser also cooperated with law enforcement after pleading guilty, completing an interview with FBI Special Agent Paula Menges in regards to the prosecution of Jesse Morton, one of Chesser's known contacts. *See* Pet'r's Reply, Ex. C ¶ 7.

Since his sentencing, Chesser has not directly appealed his conviction at any time. He has, however, filed a number of tangentially-related proceedings in the United States District Court for the Southern District of Illinois. Chesser filed this formal motion under 28 U.S.C. § 2255 to vacate, set aside, or correct sentence by a person in federal custody on November 30, 2015. He filed a motion to supplement his motion the same day. At the Court's direction, the Government filed a response to Chesser's motion, and Chesser has since replied. Petitioner further filed a supplemental motion to vacate under Section 2255 (Dkt. No. 84) and a motion for the production of exculpatory evidence. (Dkt. No. 69).

## II. LEGAL STANDARD

In order to obtain relief under 28 U.S.C § 2255, the petitioner must demonstrate: (1) the sentence was imposed in violation of the Constitution or laws of the United States; (2) the sentencing court was without jurisdiction to impose the sentence; (3) the sentence was in excess of the maximum authorized by the law; or (4) the sentence is otherwise subject to collateral attack. 28 U.S.C. § 2255 (2012). Accordingly, a petitioner's claims of actual innocence or constitutionally ineffective assistance of counsel are appropriate under a Section 2255 motion. *McQuiggin v. Perkins*, 133 S.Ct. 1924, 1926 (2013); *Murray v. Carrier*, 477 U.S. 478, 496

6

(1986); *United States v. Martinez*, 136 F.3d 972, 979 (4th Cir. 1998). Petitioner must prove his claims by a preponderance of the evidence. *See Jacobs v. United States*, 350 F.2d 571, 574 (4th Cir. 1965).

Non-jurisdictional, non-constitutional errors are only cognizable under § 2255 where the alleged error is "a fundamental defect which inherently results in a complete miscarriage of justice," or is inconsistent with the rudimentary demands of fair procedure." *United States v. Addonizio*, 442 U.S. 178, 185 (1979) (quoting *Hill v. United States*, 368 U.S. 442, 428 (1962)); *United States v. Mikalajunas*, 186 F.3d 490, 492-93, 495-96 (4th Cir. 1999). A collateral attack under § 2255 is not a substitute for direct appeal. *United States v. Frady*, 456 U.S. 152, 165 (1982); *Reed v. Farley*, 512 U.S. 339, 354 (1994). Claims that have been waived by a failure to appeal are considered procedurally defaulted, and relief under § 2255 is inappropriate unless petitioner can show cause for the failure to appeal and actual prejudice resulting from the alleged errors. *Frady*, 456 U.S. at 165-67.

### III. DISCUSSION

Chesser makes four arguments in support of his motion. First, he argues that his plea was unintelligent because he was unaware of the mens rea element of Section 875(c), which was only recently established by the Supreme Court's decision in *Elonis*. Next, Chesser argues that he is actually innocent of each count of his conviction. Third, he argues that he was provided ineffective assistance of counsel because his attorneys did not fully investigate the charges brought against him and did not explain the charges to him. Finally, he argues that the Government withheld exculpatory evidence before he pleaded guilty. These arguments will be addressed in turn. For the reasons that follow, the Court finds all of them unavailing.[1]

---

[1] Chesser also argues that his plea was not voluntarily and intelligently made on based on errors during his plea colloquy, however, these were not first made on direct appeal, and thus, cannot be collaterally attacked. *See United*

A guilty plea must be the voluntary and intelligent decision of the defendant. *Boykin v Alabama*, 395 U.S. 238, 242 (1969). A voluntary and intelligent guilty plea made by a defendant who is advised by competent counsel cannot be collaterally attacked unless it is first challenged on direct review. *Bousley v. United States*, 523 U.S. 614, 621 (1998).

"[T]he court must be able to rely on the defendant's self-interest and his truthful testimony in deciding to find the defendant guilty based on a guilty plea ... [Petitioner] bears a heavy burden in seeking to nullify the process." *United States v. Bowman*, 348 F.3d 408, 417 (4th Cir. 2003). Thus, Chesser's "declarations in open court carry a strong presumption of verity." *Blackledge v. Allison*, 431 U.S. 63, 74 (1977). Furthermore, "a prisoner found guilty based on a guilty plea is 'bound by the representations he makes under oath during a plea colloquy" unless he provides "clear and convincing evidence to the contrary.'" *Colley v. United States*, No. 1:15-CR-203 (LMB), 2017 WL 1362031, at *4 (E.D. Va. Mar. 24, 2017) (quoting *Fields v. Attorney Gen. of State of Md.*, 956 F.2d 1290, 1299 (4th Cir. 1992)).

Chesser waived his right to appeal "on any grounds whatsoever" in his plea agreement, and did not in fact appeal the validity of his plea at any time. Plea Agreement ¶ 6. Therefore, on its face, Petitioner's claim is procedurally defaulted. In order to overcome this procedural default, Chesser asserts a variety of exceptions, namely: (1) cause and prejudice, (2) actual innocence (3) ineffective assistance of counsel, and (4) Brady violations in the suppression of exculpatory evidence. Supp. Mot. at 2. None of these arguments are convincing.

### A.    Cause and Prejudice

Chesser asserts that his plea was not intelligent because he was unaware of the elements necessary to be convicted under Section 875 (c). He claims that the correct interpretation of the

---

*States v. Timmreck*, 441 U.S. 780, 783–84 (1979) (finding collateral review inappropriate for a technical violation of Rule 11 where the defendant could have raised the issue on direct appeal).

elements of this statute was not available to him until the *Elonis* case was decided in 2015 and, as such, this serves as cause for his procedural default.

In order to establish cause and prejudice, "a prisoner must clear a significantly higher hurdle than would exist on direct appeal." *Frady*, 456 U.S. at 166. Cause for procedural default "must turn on something external to the defense, such as the novelty of the claim." *Mikalajunas*, 186 F.3d at 493; *see Murray*, 477 U.S. at 488. A novel legal issue is one in which there was no "'reasonable basis' upon which [an attorney could] develop [this] legal theory." *Turner v. Jabe*, 58 F.3d 924, 928 (4th Cir. 1995) (quoting *Reed v. Ross*, 468 U.S. 1, 17 (1984)). A claim is not novel if it has been considered by the courts, even where the claim has was rejected. *See id.* (finding that petitioner's claim was not novel because it had been considered and rejected at least eight years prior to his original petition); *see also Engle v. Isaac*, 456 U.S. 107, 133 n. 41 (1982) ("Even those decisions rejecting the defendant's claim, of course, show that the issue had been perceived by other defendants and that it was a live one in the courts at the time."); *Delo v. Stokes*, 495 U.S. 320, 322 (1990) (per curiam) (finding that the existence of prior dissenting opinions regarding petitioner's claim contradicted petitioner's novelty argument). "[T]he mere fact that counsel failed to recognize the factual or legal basis for a claim, or failed to raise the claim despite recognizing it, does not constitute cause for a procedural default." *Murray*, 477 U.S. at 486-87.

Establishing prejudice in this context requires a prisoner to demonstrate that, but for the alleged error, the outcome would have likely been different. *See Brecht v. Abrahamson*, 507 U.S. 619, 622 (1993); *see also United States v. Logan*, 135 F.3d 353, 355 (5th Cir. 1998). The error therefore must have caused "actual and substantial disadvantage" to the defendant. *Satcher v. Pruett*, 126 F.3d 561, 572 (4th Cir. 1997); *Murray,* 477 U.S. at 494 (1986); *Frady,* 456 U.S. at

170 (stating that errors at trial must have created more than a mere "*possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions").

In cases where a defendant pled guilty and did not have a jury trial, the defendant's statement that his plea is voluntary and knowing is generally considered conclusive. *Savino v. Murray*, 82 F.3d 593, 603 (4th Cir. 1996). Nevertheless, a plea, is not considered intelligent unless a defendant first receives "real notice of the true nature of the charge against him." *Smith v. O'Grady*, 312 U.S. 329, 334 (1941).

The Supreme Court helped clarify the standards of "cause and prejudice" and "actual innocence" in *Bousley v. United States*, 523 U.S. 614 (1998). In *Bousley*, the Supreme Court addressed a situation in which a petitioner alleged that he was "misinformed by the District Court as to the nature of the charged crime" when he entered a plea of guilty to a firearms charge under § 924(c). *Id.* at 616. At the time of petitioner's plea, mere "possession" of a firearm was enough to constitute "use" in the context of § 924(c). The petitioner in *Bousley* did not appeal his guilty plea. *Id.* Five years later, the Supreme Court clarified the circuit split regarding the meaning of "use" in *Bailey v. United States*, holding that "use" in the context of § 924 (c) required "active employment of the firearm." 516 U.S. 137, 144 (1995). This interpretation served as the basis for Bousley's habeas petition.

The petitioner, having procedurally defaulted on this claim by not directly attacking his plea, argued that the legal basis for his claim was not reasonably available to counsel when he entered his plea, and additionally, that any attempt to attack his guilty plea on this claim would have been futile. *Id.* at 622–23. The Supreme Court rejected these arguments, noting that the "Federal Reporters were replete with cases involving challenges to the notion that 'use' is

synonymous with mere 'possession.'" *Id.* at 622. Further, the Court reaffirmed *Engle v. Isaac,* 456 U.S. 107 (1982), stating that "futility cannot constitute cause if it means simply that a claim was 'unacceptable to that particular court at that particular time.'" *Id.* at 623. Accordingly, the Court concluded that cause for procedural default did not exist.[2]

Despite this conclusion, the Supreme Court remanded the case to permit the petitioner to attempt to prove actual innocence. In doing so, it specifically noted that the Government would be permitted to present "any admissible evidence of petitioner's guilt even if that evidence was not presented during petitioner's plea colloquy and would not normally have been offered." *Id.* at 623-24. Additionally, where the Government had forgone "more serious charges in the course of plea bargaining," the petitioner was required to prove his actual innocence of those charges as well. *Id.* at 624.[3]

In *Bousley,* the "cause" argument was predicated on the Supreme Court's opinion in *Bailey v. United States,* 516 U.S. 137, 144 (1995); in this case, *Elonis* provides the legal backdrop for Chesser's petition. The Supreme Court's decision in *Elonis* was a departure from the interpretation of federal threat statutes held by a majority of circuits. Federal law criminalizes the transmission of "any communication containing any threat . . . to injure the person of another" in interstate commerce. 18 U.S.C. 875(c) (2012). The statute, however, does not explicitly state whether the defendant must have possessed a certain mental state, or rather, whether the defendant "must intend that his communication contain a threat." *Elonis,* 135 S. Ct. at 2008. Prior to *Elonis,* the Fourth Circuit in *United States v. Darby,* 37 F.3d 1059, 1066 (4th Cir. 1994), held that section 875(c) was considered to be a general intent crime due to the

---

[2] The Fourth Circuit has provided further support for Bousley's rejection of futility as a basis for cause, explaining that "[c]ollateral review would . . . serve as an all-purposive receptacle for claims which in hindsight appear more promising than they did at the time of trial." United States v. Sanders, 247 F.3d 139, 146 (4th Cir. 2001).
[3] In his dissent, Justice Scalia voiced concern over the practical difficulties of allowing the petitioner to demonstrate actual innocence in the context of a plea deal. Bousley, 523 U.S. at 629-36 (Scalia, J., dissenting).

absence of specific statutory language to the contrary. In other words, conviction under section 875(c) only required that the defendant know the nature of the communication, and intentionally send that communication. *Id.* at 1066. It was not necessary to prove intent.

    *Elonis* rejected that interpretation. In doing so, the Supreme Court reiterated that "[f]ederal criminal liability generally does not turn solely on the results of an act without considering the defendant's mental state," and held that negligence is insufficient to warrant a conviction under section 875(c). *Elonis*, 135 S.Ct. at 2012. Rather, in order to violate § 875(c), the defendant must transmit "a communication for the purpose of issuing a threat, or with knowledge that the communication will be viewed as a threat." *Id.* at 2012. The Court declined to address whether recklessness was sufficient to support a conviction under Section 875(c), or whether these threats constituted protected speech under the First Amendment. *Id.*

    The Fourth Circuit acknowledged that "*Elonis* abrogates our prior holding that liability under § 875(c) can turn solely on how a recipient would interpret a statement, without regard to whether the speaker intended it as a threat." *United States v. White*, 810 F.3d 212, 220 (4th Cir. 2016). In recognizing the effects of *Elonis*, the court noted that it had not changed the constitutional definition of a "true threat" as "one that a reasonable recipient familiar with the context would interpret as a serious expression of an intent to do harm." *Id.*; *see United States v. Armel*, 585 F.3d 182, 185 (4th Cir.2009) (quoting *United States v. Roberts*, 915 F.2d 889, 891 (4th Cir.1990)); *see also Darby*, 37 F.3d at 1066. Therefore, a conviction pursuant to Section 875(c) requires: "(1) that the defendant knowingly transmitted a communication in interstate or foreign commerce; (2) that the defendant subjectively intended the communication as a threat; and (3) that the content of the communication contained a 'true threat' to kidnap or injure." *White*, 810 F.3d at 220-21.

In this case, *Bousley* is on point and binding. Just as the petitioner in *Bousley* attempted to rely on the change in interpretation of the term "use" to establish cause for procedural default, the crux of Chesser's "cause" argument relies on a changed interpretation of Section 875(c). Specifically, he argues that the Supreme Court's holding in *Elonis* was so novel that the legal basis was "unavailable to counsel" and therefore constitutes cause for procedural default. Mot. Vacate 22. Chesser claims that *Elonis* added an element of intent to 875(c) that the majority of circuits did not recognize. *Id.*

*Bousley* establishes that the "unavailable to counsel" argument is rarely a successful one. Whether or not a majority of circuits interpreted § 875(c) as a specific intent crime before *Elonis*, many courts around the nation had done so. *See United States v. Parr*, 545 F.3d 491, 500 (7th Cir. 2008) (declining to decide the issue but noting that "[i]t is more likely ... that an entirely objective definition [of a true threat] is no longer tenable"); *United States v. Cassel*, 408 F.3d 622, 633 (9th Cir. 2005) ("[S]peech may be deemed unprotected by the First Amendment as a 'true threat' only upon proof that the speaker subjectively intended the speech as a threat."). *But see United States v. Mabie*, 663 F.3d 322, 332–33 (8th Cir. 2011); *United States v. Armel*, 585 F.3d 182, 185 (4th Cir. 2009) (applying an objective test in a true threat analysis); *Porter v. Ascension Parish Sch. Bd.*, 393 F.3d 608, 616–17 (5th Cir.2004) ("[T]o lose the protection of the First Amendment and be lawfully punished, the threat must be intentionally or knowingly communicated to either the object of the threat or a third person."); *United States v. Zavrel*, 384 F.3d 130, 136 (3d Cir. 2004) (applying an objective test in a true threat analysis).

In other words, the "Federal Reporters were replete with cases involving challenges to the notion that" a mens rea was required to establish the elements of a criminal interstate threat. *Bousley*, 523 U.S. at 622. Therefore, it cannot be said that the argument was truly "unavailable"

to counsel. *See United States v. Sanders*, 247 F.3d 139, 146 (4th Cir. 2001) ("Although the court may not have been likely to accept [petitioner's] argument, [petitioner] plainly had at his disposal the essential legal tools with which to construct his claim"). Instead, it simply represents an argument that counsel declined to pursue in light of the Fourth Circuit precedent on point. *See Bly*, 510 F.3d at 457–59; *United States v. Lockhart*, 382 F.3d 447, 451–53 (4th Cir. 2004); *United States v. McDonald*, 444 Fed. App'x 710, 712 (4th Cir. 2011) (finding issue of whether § 875(c) requires specific intent in light of *Black* settled in this circuit); *United States v. Corbett*, 374 Fed. App'x 372, 380–81 (4th Cir. 2010).

This is not like other instances of "cause" where attorneys abandon their clients or where "no judicial opinions addressing the question had been published." *See United States v. Tayman*, 885 F. Supp. 832, 847 (E.D. Va. 1995) (finding petitioner's claim novel where it was "genuinely uncertain whether 21 U.S.C. § 841(b) incorporated . . . reasonable foreseeability with respect to drug quantities trafficked by a defendant's co-conspirators."). Instead, Petitioner was represented by competent counsel who simply picked their legal battles rather than including the kitchen sink in their arguments. This is precisely the kind of rational decision making that the Sixth Amendment commits to the discretion of counsel. *See Strickland,* 466 U.S. at 688. It does not show cause for procedural default.

Moreover, even assuming the existence of cause for Chesser's procedural default, Chesser's claim fails because he is unable to prove prejudice. While Chesser argues that he would not have been convicted under section 875 (c) post-*Elonis*, by repeatedly asserting that he did not intend for his messages to be taken as threats; but a specific intent to threaten is not the only standard for conviction described in *Elonis*. The Court in *Elonis* also clearly set out "knowledge that the communication will be viewed as a threat," as sufficient to be convicted

14

under section 875(c). *Elonis,* 135 S. Ct. at 2012. Here, the record is clear that Chesser understood that his messages would be viewed as a threat.

In fact, Chesser's own statement of facts provide the basis for establishing that he possessed the requisite mens rea for conviction both pre- and post-*Elonis*. At Chesser's plea hearing, he first admitted that he had transmitted messages on the internet. He then agreed that his messages were directed to individuals who were inclined to engage in violent jihad. More importantly, however, Chesser admitted that he "understood the messages to constitute requests to attack MS, TP, and JG," and that he knew that the audience he sent the requests to had the ability to fulfill those requests. Tr. 13-14. Chesser, therefore, was fully aware that his "warnings" and messages "to pay [the individuals] a visit" would be perceived as requests to attack individuals, yet he still sent them. In doing so, Chesser satisfied every element necessary to be convicted under section 875(c) using *Elonis* as the standard. Therefore, he suffered no actual or substantial prejudice from his alleged misunderstanding of the nature of the charge against him. Because Chesser can prove neither "cause" for his procedural default, nor prejudice resulting from error, his argument fails.

B.    **Actual Innocence**

Chesser next alleges that he is actually innocent of each of the three counts to which he pleaded guilty. He also contends that he is actually innocent of the charges that the Government decided not to pursue in exchange for his plea.[4] Absent a showing of cause for the procedural default and resulting prejudice, a defendant's motion may survive if he is able to show that a fundamental miscarriage of justice would result were his claim denied. *United States v. Maybeck*, 23 F.3d 888, 892 (4th Cir. 1994). Chesser's motion for relief under Section 2255 can

---

[4] Because Chesser has not proved his actual innocence of the three charges to which he pleaded guilty, the Court declines to reach the alternative charges that were foregone by the Government.

prevail if he can show that the constitutional error in his plea colloquy "has probably resulted in the conviction of one who is actually innocent." *Murray,* 477 U.S. at 496. A petitioner asserting actual innocence must show that "in light of all the evidence," "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Bousley,* 523 U.S. at 623 (quoting *Schlup v. Delo,* 513 U.S. 298, 327 (1995)); *see also House v. Bell,* 547 U.S. 518, 536-37 (2006). Thus, actual innocence requires a petitioner "to make a stronger showing than that needed to establish prejudice." *Schlup v. Delo,* 513 U.S. 298, 327 (1995).

Actual innocence means factual innocence, not legal insufficiency of a conviction. *See Sawyer v. Whitley,* 505 US 333, 339 (1992); *see United States v. Burleson,* 815 F.3d 170, 177 (4th Cir. 2016) (holding that petitioner was actually innocent of being a felon in possession of a firearm because he "did not have a qualifying predicate conviction on his record at the time of the charged offense"). An actual innocence claim "requires [a] petitioner to support his allegations of constitutional error with new reliable evidence – whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence – that was not presented at trial." *Shah v. United States,* No. 5:12-00172, 2016 WL 6762748, at *7 (S.D.W. Va. Oct. 19, 2016) (quoting *Schlup,* 513 U.S. at 324). The Government is "not limited to the existing record to rebut any showing that petitioner might make," and may present "admissible evidence of a petitioner's guilt, including evidence that the petitioner is guilty of more serious charges forgone during the course of plea bargaining." *Bousley* 53 U.S. at 623–24. The petitioner must show actual innocence by clear and convincing evidence. *Spencer v. United States,* 894 F. Supp. 2d 721, 724 (E.D. Va. 2012); *United States v. Williams,* 396 Fed.Appx. 951, 953 (4th Cir. 2010) (unpublished) (citing *Murray,* 477 U.S. at 496; *Mikalajunas,* 186 F.3d at 493).

1.    **Count I**

Chesser argues that he is actually innocent of communicating threats in interstate commerce because he lacked the mens rea to be convicted, and because his posts do not constitute "true threats." Chesser's first claim of cause and prejudice overlaps with his claim of actual innocence. As discussed previously, Chesser is not actually innocent of Count I because he easily satisfied the necessary mens rea to be convicted of communicating threats. Although Chesser's "true threat" argument is procedurally defaulted, it nonetheless warrants a brief discussion.

A true threat is one that "an ordinary, reasonable recipient who is familiar with the context in which the statement is made would interpret . . . as a serious expression of an intent to do harm." *United States v. White*, 810 F.3d at 221. The actual recipient of the communication need not feel threatened to constitute a threat. *See United States v. Maxton*, 940 F.2d 103, 106 (4th Cir. 1991).

Chesser argues that his posts do not constitute true threats, as they were not sent directly to the targeted persons, and they did not constitute a serious expression of Chesser's own intent to injury those involved. Pet'r's Reply 5. Chesser cites many articles and interviews in which members of the general public characterized Chesser's posts as non-threatening and "not specific enough to get anyone arrested." Pet'r's Reply, Ex. A7. He also relies on *United States v. White*, 670 F.3d 498, 506, 513 (4th Cir. 2012) (hereinafter *White I*), where the Fourth Circuit held that the leader of a white supremacist group's website posting urging others to kill a civil rights attorney did not express an intent to kill the attorney himself, especially since he did not have control over the audience and his past commands had not been carried out. He then points to

17

FBI Special Agent Menges' Affidavit, arguing that it "effectively says Chesser was innocent under true threat and incitement doctrine." Pet'r's Reply Ex. C ¶ 39.

Properly understood, Chesser's motion attempts to re-litigate his case rather than prove his actual innocence. Chesser had the opportunity to challenge the sufficiency of the Government's evidence against him at trial and direct appeal, but made the decision to plead guilty instead. He now endeavors to question whether the language of his posts was sufficiently threatening to rise to the level of being a "true threat." Chesser does not, however, deny that he posted messages containing threatening language and requests for violent jihadists to "pay a visit" to the individuals listed. Nor does he deny any of the underlying facts related to his posts. His claim is solely founded on his legal innocence.

Chesser has not provided credible factual evidence to prove that "no reasonable juror would have convicted him" of communicating threats. *Bousley,* 523 U.S. at 623. Indeed, he does not submit *any* new factual evidence that would cast doubt on his conviction. As discussed above, Chesser's statements in open court show that he understood these to be objectively threatening. Tr. at 13-14. Yet Chesser has provided no new evidence to challenge his statements made under oath during his plea colloquy. He merely makes "palpably incredible" allegations that he agreed to the statement of facts because he was told to agree to everything that the Court asked. *See Lemaster*, 402 F.3d at 221. Thus, without any evidence or extraordinary circumstances to discredit his sworn testimony, Chesser's admission of guilt remains valid. In fact, in his reply, Chesser contradicts own allegations that he was advocating protests, not violence. He admits that "[a]fter the [Everybody Draw Muhammad] event, Chesser explicitly advocated violence against [participants] in a video." Pet'r's Reply at 50.

The evidence that Chesser did provide actually contradicts his claims of innocence. Primarily, Chesser mischaracterizes SA Menges' statements as probative of his innocence, despite her explicit statements otherwise. SA Menges clearly states that Chesser was attempting to "incite violence against TP and MS without legal liability" through "veiled [ ] threats and sp[eaking] indirectly." Pet'r's Reply, Ex C ¶ 39. Thus, the evidence presented by Chesser himself refutes his claim of actual innocence. In sum, because Chesser has failed to provide any evidence to prove his factual innocence, his claim of actual innocence is unavailing.

### 2.     Count II

Chesser also asserts actual innocence in regards to Count II of his conviction: soliciting others to engage in felony crimes that had as an element the use, attempted use, or threatened use, of violence, in violation of 18 U.S.C § 373. First, he argues that the underlying felonies were never charged, and as such, he cannot be guilty of something with which he was not charged. However, a straightforward reading of the transcript from Chesser's plea colloquy shows that the underlying felonies were, in fact noted by the Court. Tr. at 15. Chesser then claims that the Government did not produce "any evidence at all" of his guilt. Pet'r's Reply at 51. This argument is equally belied by the record.

Chesser does not deny that he posted "Desensitizing Federal Agents" or the Air Defense Manual, but instead argues that he is innocent because the postings were meant to "mislead the [counterterrorism] community," not to incite violence. *Id.* at 57-60. Specifically, Chesser claims that he did not ask anyone to leave real bombs around, just suspicious packages. He also states that he "did not suggest any verbal communication of a threat nor did he suggest Westerners use real bombs later." *Id.* at 57. Thus, Chesser believes he is innocent of soliciting violence.

Again, Chesser attempts to re-litigate claims that should have been raised at trial or through direct appeal. He fails to provide any evidence, let alone clear and convincing evidence, that he is actually innocent of Count II. Instead, Chesser questions whether posting his plan to desensitize Federal Agents is sufficient to constitute solicitation. *Sawyer v. Whitley*, 505 US at 339. Chesser does not dispute any of the details of the factual basis of Count II. He admits that he posted information about making bombs online as well as his plan to desensitize federal agents, in which he "urged others to leave suspicious packages that looked like package bombs in public places . . . to desensitize the public and law enforcement authorities to the threat of actual package bombs." Tr. at 15. Chesser agreed in open court to the manner and means contained in his criminal information regarding Count Two, which specifically state that he explained in the "Desensitizing Federal Agents" post that "after law enforcement had become sufficiently "desensitized" to the possible danger of such packages, a real explosive then could be substituted, which, having been discovered by a law enforcement officer, could explode". Statement of Facts ¶ 39. He then ended the message with the words "Boom! No More Kuffar." Tr. at 16.

Substantial weight is given to statements made under oath during a plea colloquy. *See Lemaster*, 403 F.3d at 221. Despite arguing that the posts, when viewed in context, could not actually be viewed as solicitation of violence, Chesser's statements during his plea colloquy and the statement of facts tell a different story. Chesser does not provide any evidence that would seriously call into question the credibility of his previous statements, and without any concrete evidence to point otherwise, Chesser has not met his burden to discredit his statements. *See Id.* Thus, Chesser's claim of actual innocence of Count II also fails.

3.      **Count III**

Chesser also argues that he is actually innocent of attempting to provide material support for a designated terrorist organization in violation of 18 U.S. C. § 2339B. Chesser specifically argues that while "[he] really was trying to join Al-Shabaab," he was unaware of Al-Shabaab's status as a Designated Terrorist Organization and that they conducted terrorist activities. Supp. Mot. at 5, Pet'r's Reply at 7. He argues that al-Shabaab did not engage in terrorism until after he attempted to join, and that he thought he would be participating by "producing propaganda." *Id.* at 119. Chesser claims that even though he told the FBI otherwise in his interview with SA Menges, he was really just "trying to trick the FBI in his last two interviews," into "letting him leave the United States . . . through a plan to be a triple agent," and thus, his previous statements should be disregarded. Supp. Mot. at 34. He suggests that his contact, Liban Mohamed, could have testified to this fact. *Id.* He also states that the Government "had very little to prove" that he was trying to join Al-Shabaab, and that "there are defenses Chesser could have presented at trial based on the Government's lack of evidence." *Id.* at 4. He then argues that "could have made a case on the actus reus side of Count 3 which would have relied on a lack of evidence." *Id.* at 5. Thus, Chesser maintains that he was unaware of Al-Shabaab's status as a terrorist organization, and therefore is innocent of Count III. Pet'r's Reply 119-20.

In light of all of the evidence, Chesser has not proven his actual innocence of providing material support to a designated terrorist organization. The burden of producing clear and convincing evidence to call question to his guilty plea is Chesser's burden alone, and he cannot now attempt to argue innocence based solely on a lack of evidence. *Colley,* 2017 WL 1362031, at *4. Here, Chesser has provided nothing more than a host of outlandish and "patently frivolous" statements and claims, including a history of Al-Shabaab's terrorist activities in

21

Somalia and statements that "he followed foreign news, not American news," as evidence that he truly was unaware of Al-Shabaab's terrorist activities. Pet'r's Reply at 68. He claims Liban Mohamed "could have testified" on his behalf; however, he has no direct evidence or any declaration from Mohamed that supports Chesser's claims of engaging in trickery, his ignorance of al-Shabaab's activities, or any of Chesser's other statements regarding Al-Shabaab. Chesser's claims are completely unsubstantiated and thus lend little support to his claim of innocence.

Moreover, Chesser's statements in open court contradict his purported ignorance of Al-Shabaab's activities. When asked if he agreed "that [he] in fact committed each and every one of those acts [listed in the criminal information] in furtherance of a violation of Count 3," Chesser replied affirmatively. Tr. at 17. Chesser then agreed that he attempted to "leave the United States and travel to Somalia for the purpose of joining al-Shabaab and engaging in violent jihad," on at least two occasions. Tr. at 18. It is illogical that Chesser would attempt to join al-Shabaab for the purpose of "engaging in violent jihad" if he was unaware that al-Shabaab conducted terrorist activities. Chesser has yet again failed to provide credible evidence that would undermine the statements made during his plea colloquy or the evidence in his criminal information. Therefore, Chesser's recent claims of innocence are insufficient to justify a finding that no reasonable juror would have found him guilty beyond a reasonable doubt of Count III.

### C.    Ineffective Assistance of Counsel

Chesser argues that his attorneys provided ineffective assistance of counsel on a host of grounds. In large part, Chesser's claims contain duplicative arguments or ones that should have been raised on direct appeal; however, there are three separate grounds that merit some attention. First, Chesser argues that his attorneys failed to inform him that he was being charged with communicating threats or soliciting others to engage in violence (Counts I and II), and that he

was not consulted by his attorneys during his defense on either of these charges. Next, he argues that his attorneys failed to investigate any of the charges against him fully. Finally, he argues that he was given erroneous information about the prison sentences associated with his that he and his wife were facing. For the following reasons, all three of Chesser's claims fail.

To establish ineffective assistance of counsel, Chesser must satisfy the two-pronged test of *Strickland v. Washington*, 466 U.S. 668 (1984), which requires showing "that counsel's representation fell below an objective standard of reasonableness" and that the defendant suffered prejudice from that substandard performance. *Id.* at 687–88. These two prongs are frequently referred to as the "reasonableness" prong and the "prejudice" prong. *See id.* Because it "is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence" and because a wide range of legitimate defense strategies are possible in a given case, "scrutiny of counsel's performance must be highly deferential." *Id.* at 689. At a minimum, however, Defense counsel's responsibilities during the plea bargain process include: (1) communicating that an offer was made; (2) relaying the precise terms of the offer; and (3) giving Defendant time and the opportunity to respond. *Missouri v. Frye*, 132 S.Ct. 1399, 1408 (2012). Counsel must also "consult with the defendant on important decisions and keep his or her client informed of important developments in the trial. *Strickland*, 466 U.S. at 688. Beyond that, counsel should be guided by rules of professional responsibility. *Missouri v. Frye*, 132 S.Ct. at 1408. "Once counsel conducts a reasonable investigation of law and facts in a particular case, his strategic decisions are virtually unchallengeable." *Powell v. Kelly*, 562 F.3d 656, 670 (4th Cir. 2009). A determination about the attorney's performance need not be made if it is clear that no prejudice resulted. *See Strickland*, 466 U.S. at 697. The burden of proving both prongs is

on the petitioner, who must do so by a preponderance of the evidence. *See Strickland*, 466 U.S. at 696-97; *Berry v. United States*, 884 F. Supp. 2d 453, 457 (E.D. Va. 2012).

A plea of guilty "entered by one fully aware of the direct consequences of the pleas is voluntary in a constitutional sense unless induced by threats[,] . . ., misrepresentation[,] . . ., or perhaps by promises that are by their nature improper as having no proper relationship to the prosecutor's business." *Brady v. United States,* 397 U.S. 742, 755 (1970). "Pleading guilty generally involves a conscious decision to accept both the benefits and burdens of a bargain . . . [which] may not be lightly undone by buyer's remorse on the part of one who as reaped advantage from the purchase." *Fugit*, 703 F.3d at 260.

To show prejudice at the plea bargaining stage, Chesser must prove there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial. *Hill v. Lockhart*, 474 U.S. 52, 59, (1985). "Courts should not upset a plea solely because of post hoc assertions from a defendant about how he would have pleaded but for his attorney's deficiencies. Judges should instead look to contemporaneous evidence to substantiate a defendant's expressed preferences." *Lee v. United States*, 137 S. Ct. 1958, 1967 (2017). When the Defendant alleges a failure to investigate or discover potentially exculpatory evidence, the prejudice determination depends "on the likelihood that discovery of the evidence would have led counsel to change his recommendation as to the plea." *Id.* at 59–60. Reasonable probability is "a probability sufficient to undermine confidence in the outcome." *See Powell,* 562 F.3d at 694. Further, Chesser must prove that the "decision to reject the plea bargain would have been rational under the circumstances." *Padilla v. Kentucky*, 559 U.S. 356, 372 (2010) (citing *Roe v. Flores–Ortega*, 528 U.S. 470, 480, 486 (2000)). This is an objective determination of

whether "proceeding to trial would have been objectively reasonable in light of all of the facts." *United States v. Fugit*, 703 F.3d 248, 260 (4th Cir. 2012).

A straightforward application of this standard illustrates the flaws in Petitioner's ineffective assistance of counsel claims. First, Chesser argues that his attorneys failed to inform him or consult with him regarding the charges against him, specifically Count 1 of Section 875(c) and the underlying felonies required for Count 2. Chesser claims that they neglected to show him "the vast majority of the non-classified discovery in his case," and what they did show him was "only relevant to count 3, [and] limited to . . . irrelevant evidence." Supp. Mot. at 146–60. He claims that they "simply handed him statutes . . . [and] only gave him 18 U.S.C. § 2339B and the related statutes, and § 2161A," with which was not charged. Supp. Mot. at 60. He further accuses his attorneys of "sidelining a client with a genius-IQ," who could have assisted in pointing out key evidence which was missing. Supp. Mot. at 56.

Next, Chesser claims that his attorneys failed to investigate the claims and evidence against him. *See id.* at 40. Chesser claims that many of his attorneys' alleged failings were due to the classified nature of the evidence, as well as prosecutorial misconduct in the withholding of the postings that served as the basis for his charges. Chesser separately alleges, however, that his attorneys could not have advised him to plead guilty in good faith had they investigated the claims against him. *Id.* at 51. He states that his attorneys advised him to plead guilty to the "JG" Posting and "Desensitizing Federal Agents" posting without having seen them. Supp. Mot. at 145. He argues that they did not have sufficient time to properly investigate the evidence and "should have requested more time or even refused the deal outright." Supp. Mot. at 55. Chesser believes that they did not conduct due diligence because "an investigation would have yielded the material Chesser uncovered through his own limited means." Supp. Mot. at 146.

Finally, Chesser argues that he was provided misleading information about the potential sentences that he and his wife were facing. He asserts that these misrepresentations influenced his decision to plead guilty. He claims that he was under the impression that his wife might spend 33 years in prison, however, she was only facing 8 years of jail time, as this was her first offense. He also states that he was not in fact facing life in prison, and would have been released by now had he gone to trial. In sum, Chesser argues that had he been properly informed of the charges and potential jail time, and if his lawyers had fully investigated, he would have chosen to proceed to trial.

Each of Chesser's assertions of ineffective assistance is unpersuasive. First, his own statements refute his argument that his attorneys failed to consult him and inform him of the charges against him. During his plea colloquy, Chesser stated affirmatively that he had gone over the "facts necessary to prove [him] guilty" and that he "understood. . .the elements of the offense charged," for each of the three charges against him. Tr. at 12, 15, 17. He further stated that he "told [his attorneys] everything about this case so that [they] could represent [Chesser] to the best of his ability . . . and [his attorneys have] been able to answer any questions . . . about the various documents." Tr. at 3. He then stated that he was "fully satisfied" with the services rendered. Tr. at 4. He has provided no evidence to refute these statements, and as such, they are taken as true. Moreover, Chesser's reply and supplemental motion to provide further evidence that Chesser was not prejudiced by his attorney's performance. He stated in his reply that he did not believe his attorneys to be ineffective. Pet'r's Reply 5. His attorneys presented him with the plea deal and provided Chesser the opportunity to respond. They also gave him guidance on whether or not he should agree to the plea hearing. Supp. Mot. at 43.

Chesser's contention that his attorneys were ineffective is based on his belief that they would not have advised him to plead guilty if they had done adequate research. Chesser, however, has provided no evidence that his attorneys did not fully investigate the charges brought against him. Rather, his dissatisfaction with his attorneys stems from what squarely falls within the purview of trial strategy and a focus on sentencing and negotiations. Chesser's admissions indicate that pleading guilty was a strategic decision. He states that his attorneys attempted to build a defense based on lack of awareness of al-Shabaab's activities for Count III, and ultimately informed Chesser that the proposed defense was not viable, providing the statute and explanations for "terrorist activity" and "terrorism" in this discussion. *Id.* Chesser admits that his attorneys told him about an email from the prosecution that contained a list of charges against him, and that he was shown a letter from the Government indicating that he would likely be convicted of some of the charges on the list. *Id.* at 49. Chesser also states that his lawyers provided counsel in terms of whether or not he should plead guilty, discussing the "inflammatory" nature of the case, after which Chesser decided to plead guilty. *Id.* The decision to focus on sentencing and negotiations as opposed to building a potentially futile defense does not indicate that his attorneys were ineffective. Chesser's accusations that this strategy was pursued without first conducting reasonable inquiry into the law and the facts of this case are therefore baseless. *Id.* at 50.

Chesser also cannot establish that he suffered any prejudice from his attorneys' performance in informing him of the potential sentence that he and his wife might receive. Chesser's assertion that he was not facing life in prison is primarily based on his current belief that he would not have been convicted of the crimes that he pleaded guilty to had he gone to trial. He does not present any evidence to show that his attorneys provided erroneous information

regarding the possible sentence he might receive. Had Chesser proceeded to trial, however, he would have opened himself up to the possibility of a longer sentence. The Government agreed to forego two additional charges: (1) dissemination of information regarding the manufacture of explosives, in violation of 18 U.S.C. 842 and (2) solicitation to commit murder in violation of 18 U.S.C. § 373 and 2332, in exchange for Chesser's guilty plea. These two charges are each punishable by up to 20 years in jail. Gov't Reply at 7. His plea agreement resulted in a 30-year sentencing cap rather than the possibility of life in prison had he gone to trial. *Id.* at 24. While Chesser doubts that he would have been found guilty, misjudging the strength of the prosecution's evidence is not a basis to invalidate a guilty plea. *See Bousley,* 523 U.S. at 619.

Similarly, Chesser erroneously believes that his attorneys provided misleading information regarding the maximum penalty that his wife was facing. Despite his claims otherwise, Chesser's wife was facing charges other than false statements which carried higher sentences. By pleading guilty, Chesser therefore gained the benefit of protecting his wife from further prosecution. Chesser's plea deal explicitly states that in exchange for his plea, the Government "will not further criminally prosecute Proscovia Nzabanita . . . for conspiring to commit or aiding and abetting the commission of the conduct described in the information or statement of facts, so long as she pleads guilty within 60 days to making false official statements, in violation of 18 U.S.C. § 1001 . . . or another felony charge acceptable to the United States." Plea Agreement ¶ 11. Specifically, rather than also being charged with more serious crime of "aiding and abetting an attempt to provide material support to terrorists in violation of 18 U.S.C. § 2339B," Chesser's plea lowered the maximum penalty to 8 years, of which Nzabanita was only sentenced to three years of supervised probation including voluntary removal from the United States. Gov't Reply 24. In sum, Chesser benefitted significantly from the reasonable and

28

calculated choices made by his attorneys, and he therefore fails to show ineffective assistance of counsel.

### D.    <u>Brady Violations</u>

Chesser argues that there are over 20 *Brady* Violations and instances of prosecutorial misconduct in his case. Supp. Mot. at 2. Condensing these arguments into five types of evidence, Chesser argues that the prosecution failed to produce: (1) the two "JG" and "Desensitizing Federal Agents" posts described in the statement of facts and criminal information; (2) other postings on his website and blog, along with magazines used at sentencing; (3) a video of the creators of South Park saying they weren't afraid of Chesser; (4) Liban Mohamed, a possible witness who would have corroborated his statements that he was attempting to trick the FBI and that Chesser believed that he would only be a part of Al-Shabaab's media wing; and (5) the information contained within an affidavit from FBI Special Agent Menges. Chesser argues that the evidence would have been exculpatory.

The suppression of favorable evidence to the accused is a violation of due process "when the evidence is material to guilt or punishment." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). In order to establish a *Brady* violation, Chesser must demonstrate (1) the evidence is favorable to him because it is exculpatory; (2) the government suppressed the evidence; and (3) prejudice ensued from the suppression. *Id.* Chesser must prove that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *See United States v. Hackley*, 164 Fed. App'x 301, 302 (4th Cir. 2006) (quoting *Strickler v. Greene*, 527 U.S. 263, 281 (1999)). No *Brady* violation has occurred when the exculpatory information is "not only available to the defendant, but also lies in a source where a reasonable defendant would have

looked." *United States v. Wilson*, 77 F.3d 472 (4th Cir. 1996) (citing *United States v. Wilson*, 901 F.2d 378, 381 (4th Cir.1990)).

Despite Chesser's allegations, he fails to show any suppression of evidence that would rise to the level of a *Brady* violation. In regards to the "JG" Posting and "Desensitizing Federal Agents" posting, the material on Chesser's website, and the video of the South Park creators, Chesser has failed to establish a *Brady* violation because even if the postings were inherently exculpatory, they were reasonably available to Chesser and his attorneys during the case. In fact, Chesser himself states that Exhibits A7 and A8, two pieces of allegedly exculpatory evidence are "some of the most easily-found online documents relating to Chesser." Supp. Mot. at 19. The statement of facts states which websites the postings were made on and describes the postings in detail. Chesser's attorneys could easily have accessed these postings, and Chesser provides no evidence that they did not see these postings. The video of the South Park Creators was also an easily accessible news item, and Chesser again has not provided evidence that his attorneys had not accessed the video. Thus, Chesser has not established a *Brady* violation in regards to the first three categories of evidence.

Chesser also has not established a *Brady* violation in the alleged withholding of Liban Mohamed as a possible witness. Chesser claims that "[i]t is impossible that the FBI was unaware that Mohamed was a relevant witness," however, the relevance of a witness does not indicate that their testimony would be exculpatory. Supp. Mot. at 30. It is unclear that Mohamed's testimony is arguably favorable, however, even assuming that it is, Mohamed's identity was reasonably available to Chesser at the time and it was Chesser himself who withheld information from his attorneys. At the beginning of Chesser's plea colloquy, Chesser stated under oath that he had provided his attorneys with important information so that they could

adequately perform their duties. Tr. at 3. Chesser now admits that he did not, in fact do so, and withheld the identity of Mohamed, who he claims to have exculpatory evidence. Supp. Mot. at 31; Pet'r's Reply at 54. Chesser cannot accuse the Government of suppressing the identity of a witness that Chesser himself had knowledge of and chose not to divulge to his attorneys.

Finally, Chesser also has not established a *Brady* violation for allegedly withholding the information contained in the affidavit of Special Agent Menges. The evidence contained in Special Agent Menges' affidavit, first and foremost, was not exculpatory. Despite Chesser's mischaracterization, she plainly states that Chesser had the requisite knowledge to be convicted of communicating threats. Moreover, it would have been impossible for the Government to produce SA Menges' affidavit at the time because it did not exist. The affidavit was created in connection with the prosecution of Jesse Morton in 2011, well after Chesser had pleaded guilty. As such, Chesser has failed to allege any colorable *Brady* violation. For these same reasons, Chesser has also failed to provide sufficient justification for the production of exculpatory evidence.

## IV. CONCLUSION

For the reasons stated above, and for good cause shown, Petitioner's motion and supplemental motion to vacate, set aside, or amend his sentence pursuant to 28 U.S.C § 2255 (Dkts. No. 67, 84) is hereby **DENIED** and his petition is hereby **DISMISSED**. His motion for the production of exculpatory evidence (Dkt. No. 69) is similarly **DENIED**.

This is a final Order for purposes of appeal. To appeal, petitioner must file a written notice of appeal with the Clerk's Office within sixty (60) days of the date of this Order. *See* Fed. R. App. P. 4(a)(1)(B). A written notice of appeal is a short statement stating a desire to appeal this Order and noting the date of the Order that petitioner wishes to appeal. Petitioner need not

explain the grounds for appeal until so directed by the appeals court. Petitioner must also request a certificate of appealability from a circuit justice or judge. *See* 28 U.S.C. § 2253(c)(1)(B); Fed. R. App. P. 22(b). For the reasons stated above, this Court expressly declines to issue such a certificate.

The Clerk is **DIRECTED** to forward a copy of this Order to the *pro se* petitioner.

It is **SO ORDERED**.

August 21, 2017
Alexandria, Virginia

Liam O'Grady
United States District Judge