UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA

Civil No. _____
Criminal No. 1:10-cr-395-LO-1

UNITED STATES OF AMERICA,
    Respondent,

v.

ZACHARY ADAM CHESSER,
    Movant.

---

Declaration in Support of Second Motion Under 28 U.S.C. § 2255

---

I, Zakariyya Al-Uqtani (Zachary Chesser), state the following to be true under penalty of perjury:

1. Revolution Muslim was a Jihadi activist organization to which I belonged at the time of the 'South Park' campaign underlying Count One, but which I left prior to the posting related to JG. We espoused Jihadi views and used inflammatory rhetoric to shock our audiences and gain attention, but we used these tactics to draw eyes and ears to a more substantive message: our opposition to wars in the Muslim world, American foreign policy, moral and political beliefs, opposition to the exploitation and oppression of Muslim, and more. We engaged in both the inflammatory and substantive sides of our activism through online writings, discussions, videos and other forms of engagement, through street protests and speeches, through public debates, and other methods. By the time of the 'South Park' campaign in April 2010, we had been thoroughly covered in the media, and there was a wide public awareness of our tactics and that we engaged in political hyperbole. We had clarified in the media that we were not a violent group in terms of our methods and did not call for violence on U.S. soil. Our tactics of political bluster aimed at attracting attention to a substantive message were widely known. When I made calls for counterspeech, protests and similar forms of expressive opposition I expected them to be understood as such, not as dog whistles for violence, and this is how we were understood by the public as far as my own knowledge of it stretches. Also, I expected our audience to interpret our use of violent speech in light of familiarity with our past uses of violent speech and clarifications of our purpose.

PAGE 1

Exhibit A

2. In April 2010, the cartoon 'South Park' aired two episodes purporting to "depict" the Prophet Muhammad (peace be upon him) in a bear costume, although, in order to satirize what the show incorrectly saw as the source for Muslim outrage over the Danish and Swedish cartoons depicting him as a dog, a rapist, and a suicide bomber, among other things, the costume turned out to be empty at the end of the episodes. This followed a campaign by the fictional citizens of the town South Park to get the Prophet (peace be upon him) to remove his costume, which would cause him to actually be depicted in the show. In the episodes, this provoked Muslims to form a violent mob in order to prevent his depiction. This was all based on a misperception that Islam's prohibition on depicting faces was the source of Muslim opposition to the Danish and Swedish cartoons. The real issue was their Islamophobia and their denigration of the Prophet (peace be upon him). The show also argued that the exceptional treatment of the Prophet (peace be upon him) was a threat to free speech, that because the show was an "equal-opportunity offender" Muslims should not be insulted or hurt by the mockery of the Prophet (peace be upon him), and that causing offense and pain by mocking the sacred was valuable for its own sake.

3. Over the course of about a week, beginning on or around April 15, 2010, I embarked on an advocacy campaign on our website, on social media, through email, through media interviews and through other mediums to argue that the issue was denigration, not depiction; that while substantive debate and disagreement had value, insulting things people held sacred just to hurt and offend them did not have enough value to offset the harm; that it was possible to proscribe it without fear of a "slippery slope"; that the "equal-opportunity offender" defense was morally hollow; that the solution to the exceptional status for the Prophet (peace be upon him) was to extend the same decency to the figures held sacred by other religions and cultures; that the denigration of cultural and religious symbols and beliefs was a strategy that occupiers and oppressors used to weaken, delegitimize and exploit subjugated populations; that 'South Park's' creators were unwittingly facilitating wars, violence and oppression against Muslims, including the wars in Iraq and Afghanistan; that evaluations of which speech deserved platforming and protection ought to consider the balance of power between a speaker and those impacted by their speech and whether that speech facilitated or upheld oppression; and that the spirit of the First Amendment was lost when it was used by the powerful to shield speech that helped exploit and oppress those with less power. In keeping with our usual methods, I came up with a plan to attract the media and others to our substantive platform on this issue and our criticisms of American wars and foreign policy by (1) predicting the creators of 'South Park," Matt Stone and Trey Parker, would be killed by others for airing these episodes and (2) advocating the idea that this

PAGE 2                                                               Exhibit A

could potentially be morally justified in Islamic law. However, because my mother was a prosecutor and I grew up discussing First Amendment issues with her and her prosecutor wife, I had a layman's understanding of the recipient-oriented objective test that defined true threat doctrine at the time, so I knew it was important to make sure my audience would not understand me to be threatening or inciting violence. Because of this, I planned to (and did) take extensive steps to make sure I would not be misunderstood as threatening or calling for violence. Throughout this campaign, I always clarified that this was not my purpose, and I did not expect people to ignore these clarifications that the plain meaning of my words was what I intended and nothing more. Nor did I expect them to understand calls for protest and counterspeech to be dog whistles for violence, especially not after the media reported the fact that this was what we meant and that we were planning protests. We were, in fact, planning protests, although we never actually had them.

4. Exhibit B is a somewhat incompletely preserved but otherwise true copy of a posting I made to the sites for Revolution Muslim and The Mujahid Blog (a largely analogous blog I ran on my own) on April 15, 2010. The dead person in the beginning of the posting is Theo Van Gogh, who was murdered for a film he made with Ayaan Hirsi Ali, which the killer saw as desecrating the Qur'an. The killer stabbed a note threatening Ali into the corpse of Van Gogh. After asking where they live, I linked to an article which is found at Exhibit C. I posted it separate so that it would appear to someone who wasn't careful that I had provided useful information to a would-be assassin, but the actual article does not provide useful information and I would not have linked to it if it had included something like an address. On page 3, it is missing the two videos I included. The first was an audio clip from an Anwar Al-Awlaki lecture, which was identical to the one covered by Exhibit D. The second was a clip from a lecture by someone whose identity I am not certain of and which was not in my discovery. However, I recall that they mentioned in favorable terms when Salah Ad-Din executed a Christian crusader who had committed genocide and perpetrated other atrocities and who had denigrated the Prophet (peace be upon him). I intentionally included only clearly-labeled "fan mail" addresses which would not, I believed, be useful to anyone trying to commit actual acts of violence.

5. Exhibit D is a true transcript of the images and audio from a video I uploaded to the websites for YouTube, Revolution Muslim and The Mujahid Blog on April 18, 2010. The Bureau of Prisons would not let me copy the actual video file from my discovery.

6. On April 19th or 20th, 2010, I gave a calm, polite interview with a Fox News journalist, in which I explained

PAGE 3

Exhibit A

these postings and expanded upon Revolution Muslim's broader platform, in keeping with our modus operandi of gaining attention through shocking expression and pivoting to a more substantive message. This occurred over a phone that the FBI was bugging pursuant to FISA warrants, as is clear from their disclosures. I explained that the point of the violent expression was to convey how seriously the episode of 'South Park' had hurt and offended Muslims. I explained our reasons for opposing the show's portrayal. I reiterated that I was only predicting violence by others, not threatening it myself. Exhibit E is the article that journalist wrote, and it accurately reports what I said, although it does not cover the tone or the full content like a recording would.

7. On April 21, 2010, Morton and I released the essay at Exhibit F on two Jihadi forums. We'd written it together over the preceding days instead of doing media interviews. We had to post it on other sites, because our own site had been hacked and was down. It is worth noting for the sake of history that this was a form of illegal censorship which the government did not do anything about, even though it prosecuted our protected speech. Also, the government ignored explicit threats to murder us for our expression, which were delivered by all sorts of people to phones and accounts they were apparently surveilling.

8. On May 18, 2010, I made a posting called 'Tracking Everyone Draw Muhammad Day' to the private section of the Ansar Al-Jihad forum. The Ansar forum was invite-only, and only three of its many topic sections were visible to non-members, and even these redacted all identifying information of those posting it. This posting collected publicly available information off of the Facebook profiles of people who had joined a Facebook event called "Everybody Draw Mohammed Day." At least at that time, joining an event on Facebook did not necessarily mean one planned to participate in it. What it expressed was that one wanted Facebook to notify them when the event occurred. This event was scheduled for May 20, 2010, two days after my posting. The event was appropriated by people who were involved in Islamophobic hate sites from a suggestion in a cartoon by a Seattle-based cartoonist named Molly Norris. Her cartoon was not denigrating, and she made it in response to my campaign criticizing 'South Park,' misunderstanding the point of the campaign and thinking it was about depiction, not denigration. I did not think that Molly Norris herself was trying to promote the kind of vulgar and Islamophobic mockery that this event ultimately came to represent, so I never focused criticism on her. However, I was opposed to some of what the event was trying to achieve. As far as I knew, none of the eleven people whose information I gathered in this private posting had done anything that I felt deserved criticism, let alone threats or calls for violence, especially since the event had not even occurred. The information I gathered was only what was available

PAGE 4

Exhibit A

to the entire world within one click of the Facebook event. It included whatever name and picture, if any, the person was using on Facebook. For some people it included information on the country, state and city they lived in. For some, it included information they had posted on places they attended. It did not include a single address. At the end of the posting I wrote, "Just a place to start." Those were my only words which were not simply republishings of information off of Facebook. There was no violent speech. There was nothing even implicitly violent. My thinking behind this posting was to punish Facebook for hosting this event by exacerbating a boycott over its privacy policies. That boycott was based on the idea that Facebook made it too hard to hide one's personal information. I figured that if a Jihadi collected a bunch of personal information for people doing something that a Jihadi obviously opposed and published it, this would go a long way toward making the boycott's point. I was barely even publishing that information for other people to see. I was mostly just using the forum like a word processor as a place to gather and collect it. I planned to eventually publish it in a public section of the forum. I did not care about the boycott itself, but I did want to help it out to punish Facebook. I planned to collect more information and was vaguely hopeful that someone else might join in, which is why I wrote, "Just a place to start." I did not mean "start killing." I meant "start collecting." However, I decided it would take too long to collect enough information to cause a controversy, so I gave this idea up. It would not have made sense for me to be threatening these individuals for something they had yet to do in a forum they could not see, since it could not deter them, and they hadn't done the thing that would possibly have upset me. It did not occur to me for a single second that someone reading what I posted might view it as anything violent at all, let alone a threat of incitement. My Statement of Facts says I posted this in the same thread as my 'South Park' postings. I definitely did not do that, just as I did not post addresses. If it is referring to the 'Clarification Statement,' then I also did not post it in the same 'topic.' While it is possible I posted it in the same topic as some other 'South Park' postings, I don't think I did, and these would have been long buried by dozens of other postings by the time of this one. Nobody would have drawn any significance from them being in the same topic. I also do not know who "JG" is. I don't even know if I posted their information, but it would not have gone beyond what I just described.

9. I was, and am, a Sunni Muslim. In Sunni Islam there are general rulings of Islamic law called "fiqh,"

PAGE 5

Exhibit A

while a ruling that a particular ruling applies to a particular situation is called a "fatwa," and a binding judgment that one must act upon is called a "qadiyah." This latter category only occurs in an Islamic court in an Islamic state. While a layman can repeat any of these rulings, they cannot derive fiqh rulings, make judgments or issue fatwas. Only an actual Islamic scholar can do those things. I was fairly new Muslim in 2010, not an Islamic scholar, and I have never been particularly close to being an Islamic scholar--not even after eighteen years in Islam. When I was mentioning the opinion that the death penalty applied to those who mocked the Prophet (peace be upon him), this was an example of fiqh. Applying it specifically to Stone, Parker or JG would be a fatwa. I was not qualified to do that. Even as a Jihadi, I would have believed myself to be sinful had I done that, because I would have been speaking without knowledge. And any Jihadi who acted upon my words or without a qualified scholar issuing a fatwa would have been sinful for acting without knowledge. I made very clear to my audience that I was not an Islamic scholar and never claimed to be one. I could not issue a fatwa, and I did not expect my audience to think I was doing so. Not only this, but in Sunni Islam, a fatwa does not create any sort of obligation to act outside of the persuasive force that of its arguments that there is an obligation--should someone issue a fatwa to that effect. The Iranian Shi`ah fatwa about Salman Rushdie was not something I or my Sunni audience had anything to do with. Part of the reason I did not threaten or call for violence was that I did not believe I was Islamically qualified to do that. Even as a Jihadi, I believed I would have been sinful for that. And my Jihadi audience had the same views as far as I was aware. I did not believe myself to even be capable of inciting an act of violence, no matter what I said or how I said it, because this fundamental issue of credibility was missing. Also, this was prior to Al-Qa`idah's announcement of its strategy and authorization of independent acts of violence by Western Muslims. This campaign occurred in the final days of a Jihadi culture and structure in which every single individual act of violence by a Jihadi had to be specifically sanctioned by one of the militant organizations overseas. This was because such acts might or might not fit their strategies and because of Islamic beliefs about the need for leadership and structure. The man who killed Theo Van Gogh belonged to a sect that was considered extremist even by Jihadis. At this time, the vast majority of Jihadis would have believed it to be wrong to do anything to Stone, Parker or JG without sanction from one of these groups, so even a fatwa would not be enough to give that permission. And, even then, this is only permission. When I embarked on this campaign, I expected my speech to be understood--especially by the Muslims whom the government alleges might have carried out violence--in light of these strictures.

PAGE 6

Exhibit A

10. Jesse Morton, my co-campaigner, and I engaged in multiple media interviews during the course of this campaign. One of these was my interview with CNN, which is partially, but accurately, reported on in Exhibit H.

11. We both gave other interviews, all of which explained we were only predicting third-party violence, were only abstractly advocating the potential moral propriety of violence in a general sense--raising awareness of the fiqh ruling--and not calling for actual violence to occur, and that we were only calling for nonviolent dialogue, counterspeech and protests. We used these engagements to advocate our more substantive message about the freedom of speech and why we opposed America's policies toward Muslims. All of these interviews should be fully preserved in the FBI's classified FISA surveillance, based on their disclosures of the things they were monitoring.

12. Morton and I did, in fact, engage in the dialogue and debate we called for, and Morton hosted the "open dialogue sessions" we promised in our 'Clarification Statement.' We discussed and debated all of the issues we raised in the media, on websites and vial email. This should all be fully captured in classified FISA surveillance.

13. Exhibit J is a verbatim copy of an interview I did with Aaron Zelin and two others in 2010, after the events in Count One were over, but before my arrest. This is an excerpt. The full interview is at doc. 81-9.

14. I read the article at Exhibit K when it was published. It originally contained a link to a video in which Matt Stone and Trey Parker, although furious at us and Comedy Central, said that they were not afraid and did not think there was any actual risk to their lives from our speech.

15. I had many goals with this campaign, but none of them included threatening or inciting violence against Stone, Parker or JG. I did not even believe myself capable of inciting such violence, and I did not believe it would be correct for someone, including myself, to do so without a fatwa and being convinced the fatwa was correct. Among my goals was using violent themes and suggestions to shock people and gain a larger audience for our more substantive message about American foreign policy and the freedom of speech, to provoke debate and to facilitate dialogue. As a Jihadi, it was hard to get people to engage with us in normal conversation, so we had to do something to compel attention. I was also sincerely trying to persuade non-Muslims to stop denigrating the Prophet (peace be upon him), as well as other religious figures, with these substantive arguments. I also wanted to promote awareness of the general fiqh ruling I believed was correct, which was that the death penalty applied in Islamic law when someone mocked the Prophet (peace be upon him). While I was not certain of what the result would be if actual Islamic scholars issued fatwas on this issue, I was also trying to stir up enough controversy that one would issue a fatwa as to whether or not the general ruling I believed in should apply specifically to Stone and Parker.

PAGE 7    Exhibit A

As far as I know, the only fatwas that were issued said it did not. I also wanted to use the attention and shock to normalize Jihadis with the public and make space for Jihadi speech. Finally, I wanted to provoke an Islamophobic backlash against the Muslim community. I had watched a BBC documentary which argued that the Islamophobia European Muslims experienced in the backlash over the Salman Rushdie protests contributed to more support for the Jihadi cause in Europe than in America. This was consistent with what I knew to the be driving factors for the support of that cause. Contrary to various Islamophobic narratives that frame support for the Jihadi cause as driven by some sort of process of "radicalization" derived from exposure to ideas intrinsic to Islam or some particular strain of Islam and narratives citing socio-psychological factors, actual causation is driven exclusively and entirely by (generally accurate) perceptions of injustice, oppression and violence against Muslims perpetrated by non-Muslims and Muslims acting in their interests, and the Jihadi cause is just one of many offering a solution and a framework for understanding and responding to that inequity and violence. Perhaps not entirely consciously, I had come to see the Jihadi solution as the only possible solution, so I saw exacerbating the Islamophobia that drove some Muslims to support the Jihadi cause as serving a greater good. This was wrong from both moral and practical perspectives, but this is how I saw things at the time. I sought to replicate an Islamophobic backlash against the American Muslim community in hopes of making the Jihadi solution more appealing down the road by fueling its motivating factors. I deliberately caricaturized myself as a Jihadi with the way I phrased things and used violent imagery and rhetoric in order to appeal to the agendas of Islamophobic hate sites and the sensationalist media--many of whom, we knew from experience and watching how narratives moved from our site into mainstream media, frequented those hate sites. I was both attracting their attention and doing what I could to make them portray my Jihadi message like it was representative of all of Islam--much like what the prosecution has done in this case and what Ayaan Hirsi Ali did in the editorial they used in their sentencing brief. We also hoped to get media attention on the protests we were planning, because this would provoke a serious backlash and also create an idea of Jihadi ideas being normalized in America.

PAGE 8

Exhibit A

16. I have always denied threatening or calling for violence against Matt Stone, Trey Parker and JG. This began with my Original Posting on April 15, 2010, and it has never ceased. Even after pleading guilty, I continued to express that this was not what I did and not what I intended with my words. And I only pled guilty because the government threatened to prosecute my wife and my lawyers made me think she would be likely to do serious time in prison. We had an infant son at home, and I was desperate to make sure he did not lose both of his parents, although the FBI and others later helped my mother take custody of our child from us in court anyway. My attorneys, perhaps without grasping how I understood what they were saying, led me to believe that I could easily challenge my convictions down the road if I wanted in spite of pleading guilty. I always professed an intention to challenge my threat conviction if I thought I could, because I knew I hadn't threatened anyone or tried to get anyone killed. Exhibit M is part of an essay I wrote in Summer 2012 and published in August of that year. It is mostly about the child custody battle and other post-arrest experiences, but in it I was also trying to take the blame for any failures that resulted in our speech somehow breaking the law and to exonerate Jesse Morton. What I said on this is true. It was said at a time when the government was denying me any access to my case file--something that lasted five years--so I was unable to evaluate whether I had any grounds to overturn my convictions. I was not trying to exonerate myself with these words, but I also was not dishonest about what we actually did and intended.

17. During the course of this campaign, Morton and I communicated extensively about our efforts online and over the phone. We planned discussions and protests. We planned how to gain media attention and exploit it for all of the goals I've mentioned. We strategized about how to use violent expression to secure that attention but also how to make sure nobody would understand us to be threatening or calling for violence. We expressed how we felt we had avoided crossing that line. All of this would have been captured by the FBI's FISA surveillance based on how these communications occurred and their disclosures about what they were surveilling.

18. Exhibit N is a copy of part of my responses in an interview with journalist Peter Bergen, which occurred in or around 2013. It accurately captures my memory of events and my views at the time. I was still a Jihadi and I was gloating, not trying to establish my innocence from a legal perspective. In it I talk about how I wanted to make counterterrorism analysts worry the American Muslim population was becoming as amenable to the Jihadi cause as

Exhibit A

Europe's. In one of my conversations with Morton, I mentioned that making non-Muslims more worried was one reason to post our 'Clarification Statement' on Jihadi forums. This was in reference to this type of worry. I was working to unite European Jihadi voices under Revolution Muslim's umbrella. This unification had not received much attention, and there was still a perception that Revolution Muslim was a pariah on mainstream Jihadi sites like the forums I was mentioning. However, I had repaired these rifts, and I felt that publishing our essay on them would make that apparent to those who cared about such things. The "worry" I was trying to inspire was a worry that Revolution Muslim was helping synthesize the American and European Jihadi movements and was emerging as a leader in the mainstream Jihadi movement instead of remaining a pariah. That comment, which is referenced by Special Agent Paula Menges in Exhibit G, had nothing to do with Stone or Parker in any way. It was aimed at experts, not people who would not understand this sort of nuance.

19. On June 15, 2010, I made a posting called 'Desensitizing Federal Agents' to the Al Fallujah online forum. This posting consisted of a few (my recollection is three) short paragraphs written in a sarcastic tone. I advocated the idea of leaving bags and similar mundane objects in public places. I was very careful not to suggest anything beyond this ordinary act. I did not suggest leaving them in particularly suggestive places. I did not suggest reporting them or drawing attention to them. What I suggested was identical to any ordinary person leaving any ordinary bag in any ordinary place for any ordinary reason. Except that I suggested that if enough bags were left in public, eventually they would draw bomb squad responses. And if the same bomb squad responded to enough harmless objects, eventually they would grow careless. And if that same bomb squad happened to encounter a real bomb that had been discovered, then they were more likely not to take proper precautions and get someone killed. I did not advocate planting a real bomb. The idea was that someone acting independently of the bag-placer would be more likely to succeed. It was not a serious idea. It was a half-joke I was pulling on the various counterterrorism analysts, bloggers and journalists who followed me around everywhere online. I wrote that piece with them in mind and did not care if anyone actually acted upon it. The idea itself would have been a waste of time. And I was trying to waste the time of these so-called experts who read everything I wrote and blogged about it. I posted this to the English section of the Al Fallujah forum. That section was obscure and had few Jihadi viewers. The forum itself was aimed at an Arabic audience, and it wasn't even formatted to handle English writing. Nearly my entire audience on these forums was made up of the counterterrorism crowd. I only got single-digit and low double-digit views on these postings, which was not enough to imply a serious Jihadi audience. There

PAGE 10

Exhibit A

would be bots and a dozen or two counterterrorism types accounting for all or nearly all of those views. This is as compared to my audience on other platforms where I received thousands of views each day. I reached hundreds of thousands of total views each month across these platforms, whereas my total views on Al Fallujah over my entire history of posting on that forum would not have exceeded the low hundreds--not, at least, prior to my arrest. I was not trying to get anyone to actually act upon this idea. If I was, I would have posted it somewhere else.

20. Exhibit P is a related posting that planted the seed for this idea in my mind. I posted it to two Jihadi forums--Al Fallujah and Al-Qimmah--on June 8, 2010. The first sentence at the beginning and the last paragraph at the end are me, while the rest is from a news article I copied and pasted. This posting was not intended to advocate anything at all, let alone incite it or otherwise cause it to happen.

21. The TSA Manual and Air Defense Manual referenced in my Statement of Facts and Criminal Information had nothing to do with the above postings. I reposted the TSA Manual the previous year, never really advertised it, only posted it after the TSA had said that the manual (which they themselves published in a way that allowed someone to remove its redactions) did not have information that harmed security, and removed it from my websites by April 2010. The Air Defense Manual was contained in a file with over two hundred other books. I never read it. I never even looked inside it. I just downloaded it and reuploaded it with a whole bunch of other books I mostly also did not look inside. When I posted this file, I did absolutely nothing to highlight this manual. In neither case did I encourage anything at all whatsoever in these postings.

Executed on: March 2, 2026

*Zachary A. Chesser*

PAGE 11

Exhibit A



Theo Van Gogh - Have Matt Stone And Trey Parker Forgotten This?

## SOURCE

Fans of the popular series South Park are waiting for tonight's episode after it was revealed the episode will include a portrayal of the character of the Muslim prophet, Muhammad.

PAGE 1

1

EXHIBIT B